Sean A. Commons (SBN 217603)
scommons@sidley.com
Lauren M. De Lilly (SBN 301503)
ldelilly@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 896-6010
Facsimile: (213) 896-6600

*Attorneys for Plaintiff*
*The Honest Company, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE HONEST COMPANY, INC., | Case No. 2:26-cv-0019-WLH-MBK |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| BUTTERBLU, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

FIRST AMENDED COMPLAINT

Plaintiff The Honest Company, Inc. ("Honest") hereby sues Butterblu, LLC ("Butterblu" and, collectively with Honest, the "Parties") and, upon information, belief, and investigation, alleges as follows:

### INTRODUCTION

1. Honest is a personal care company dedicated to creating cleanly-formulated and sustainably-designed products for conscious consumers. Honest has become one of the market leaders in the diapers and wipes, skin and personal care, and household and wellness categories. Its brand has resonated with consumers who are focused on products that promote their health, families, and homes.

2. In 2019, Honest and Butterblu were parties to a licensing agreement by which Butterblu could leverage Honest's renowned and valuable trademarks and other intellectual property on infant and toddler apparel, bedding, and towels. The licensing model under that agreement proved unworkable. In 2022, the Parties began to explore a new arrangement by which Butterblu would market and sell organic Honest Baby Clothing® branded apparel, bedding, and towels (the "Products").

3. In August 2022, the Parties entered a new agreement by which Honest took over ownership of all Products in inventory, and by which Butterblu thereafter sourced, marketed, and sold the Products in exchange for a service fee. Under this new service provider agreement (the "Agreement"), Honest held title to all such Products and was to exercise greater control over the sourcing, marketing, and sale of the Products. Butterblu sold the Products on the website www.honestbabyclothing.com and to resellers such as Amazon.

4. Unfortunately, Butterblu did not abide by the terms of the Agreement. As more fully described below, Butterblu failed to live up to the obligations and terms of the Agreement (as amended), including by, among other things, failing to obtain Honest's approval before purchasing Products from suppliers, failing to

1

FIRST AMENDED COMPLAINT

share information with Honest as required by the contract (and concomitant with Honest's rights as owner of the Products), failing to follow Honest's directions on pricing the Products, failing to use best efforts to promote and sell the Products while maintaining the value and goodwill of the Honest® brand, failing to properly calculate amounts due under the Agreement, and secretly developing and selling a baby apparel product line in direct competition with Honest Baby Clothing® brand products.

5. As a result of multiple uncured and incurable breaches of the Agreement, breaches of fiduciary duties, and other misconduct by Butterblu, Honest terminated the Agreement on November 5, 2025. The Parties, however, agreed to temporarily pause this litigation (without prejudice) and entered into temporary agreements (reserving all rights) after November 5, 2025, with the last of those temporary agreements expiring on December 22, 2025. Butterblu did not comply with its obligations to Honest under those temporary agreements, either, leaving Honest with no option but to resume this litigation.

6. Butterblu also has used Honest's intellectual property without authorization. Among other things, Butterblu used Honest's intellectual property on Products without authorization. Butterblu's baby apparel line, launched in or about November 2025, also includes designs that bear a confusing similarity to, and are unauthorized imitations of, Honest's protected designs. Furthermore, Butterblu has made misleading representations about Honest's commercial activities to drive consumers away from Honest's Products to instead purchase Butterblu's infringing products.

7. Honest now brings this action seeking a declaration of rights under the Agreement, relief for Butterblu's breaches of the Agreement, relief for Butterblu's infringement of Honest's intellectual property rights, and relief for other wrongdoing engaged in by Butterblu.

## THE PARTIES

8.      Plaintiff The Honest Company, Inc. is a Delaware corporation with its principal place of business located at 12130 Millennium Drive, #500, Los Angeles, California 90094.

9.      Defendant Butterblu, LLC is a limited liability company organized under Delaware law with its principal place of business located at 5 Pony Lane, Westport, CT 06880.  Butterblu does not appear to be registered with the California Secretary of State to conduct business in California.

## JURISDICTION AND VENUE

10.      This Court has original jurisdiction under 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1332, and 1338, because certain of Honest's claims arise under federal law, namely, the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, because the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and, on information and belief, the Parties are citizens of different states. Out of all of its members, Butterblu contends one member, in turn, has a trust as a member with a corporate trustee incorporated in Delaware, but based on information and belief, that corporate trustee lacks sufficient powers or authority to be considered a real party in interest; therefore, the citizenship of the corporate trustee should be disregarded for purposes of diversity jurisdiction.  To the extent diversity jurisdiction does not exist under 28 U.S.C. § 1332, jurisdiction over Honest's state law claims is also proper pursuant to 28 U.S.C. § 1367, because the state law claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.      This Court has personal jurisdiction over Butterblu.  Butterblu purposefully availed itself of California because Butterblu transacts and does business within this judicial district, the claims at issue arise from conduct in this district, and the Parties entered into the agreements at issue in this district.  In

FIRST AMENDED COMPLAINT

addition, the Agreement expressly provides that all disputes are to be resolved in this district.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the injury in this case substantially occurred in this district, and the Parties have agreed by contract to this venue.

## NATURE OF ACTION

### A. Honest's Adoption of and Investment in Its Trademarks

13. Since its founding in 2012, Honest has achieved remarkable commercial success, building a reputation among consumers as a conscious company that offers clean, safe, and high-quality products. Honest connects with consumers directly online and through major retailers (*e.g.*, Amazon, Target, Walmart).

14. Since 2013, Honest has used the trademark HONEST in connection with the manufacture, advertising, and sale of baby products. Those products have been extremely successful, with Honest having sold millions of baby products under the HONEST mark. Honest's product offerings have since expanded to cover not just baby products, but also baby, toddler, and child apparel, and personal care products for the entire family, including skincare, makeup, and bath and body products.

15. Honest has expended considerable amounts of time, effort, and expense to promote the HONEST trademark and the products bearing that mark. By virtue of these efforts and the excellence of the products associated with the HONEST mark, the HONEST mark has achieved an extraordinary degree of consumer recognition, and is uniquely associated and identified with Honest. Moreover, the goodwill associated with the HONEST mark is invaluable.

16. Honest is the owner of several federal registrations for HONEST-related marks, including:

- 4 -
FIRST AMENDED COMPLAINT

| Mark | Registration No. | Goods or Services | Attachment |
|---|---|---|---|
| HONEST | 4,506,748 | Swaddling blankets; crib blankets | **Exhibit A** |
| HONEST | 6,839,596 | Children's and infant's apparel, namely, jumpers, overall sleepwear, pajamas, rompers and one-piece garments; infant and toddler one-piece clothing; infant sleepers; infant wearable blankets; all of the foregoing for children and infants; none of the above being belts or leather belts | **Exhibit B** |
| | 6,839,597 | Children's and infant's apparel, namely, jumpers, overall sleepwear, pajamas, rompers and one-piece garments; infant and toddler one-piece clothing; infant sleepers; infant wearable blankets; all of the foregoing for children and infants; none of the above being belts or leather belts | **Exhibit C** |
| HONEST BABY CLOTHING | 6,309,022 | Crib sheets; baby and children's blankets; quilts; comforters of baby/toddler bed size; diaper changing pad covers not of paper; burp cloths; hooded baby towels; wash cloths | **Exhibit D** |
| HONEST BABY CLOTHING | 6,309,023 | Infant/toddler coveralls; mittens; hats; socks; booties; footies; body suits; t-shirts; tops as clothing; jumpers; sweaters; pants; gowns; jackets; dresses; sleepwear; cloth bibs; | **Exhibit E** |

- 5 -

| Mark | Registration No. | Goods or Services | Attachment |
|---|---|---|---|
| | | toddler training underwear; pajamas | |

17.     Honest's marks identified above are referred to collectively herein as the "Honest Marks."

18.     In addition to its creation, adoption, and development of the Honest Marks, in or around 2022, Honest created and designed a distinctive and non-functional print design depicting stylized holiday trees (the "Feelin' Pine Print"). Honest's Feelin' Pine Print is depicted below:



19.     The Feelin' Pine Print includes a unique and distinctive pattern of alternating holiday trees against a winter landscape background.  That pattern is neither common nor borrowed from some other source.  Instead, it is a distinctive pattern created and designed by Honest solely for use in connection with Honest's genuine products.

20.     Honest has utilized the Feelin' Pine Print in connection with the manufacture, advertising, and sale of baby and family products, including diapers, blankets, beanies, teethers, burp cloths, and cotton pajamas for adults, kids, toddlers, and babies. An example of such use is depicted below:

- 6 -
FIRST AMENDED COMPLAINT



21.    Since first developing and introducing the Feelin' Pine Print, Honest consistently used and still uses the Feelin' Pine Print on its genuine products only available through Honest and/or its authorized retailers and distributors.

22.    Also in or around 2022, Honest also created and designed a distinctive and non-functional print design depicting a striped, pastel rainbow (the "Rainbow Stripe Print"). Honest's Rainbow Stripe Print is depicted below:



23.    The Rainbow Stripe Print includes a unique and distinctive pattern of a pastel rainbow-colored gradient in horizontal stripes that alternate with white stripes.  That pattern is neither common nor borrowed from some other source.

- 7 -
FIRST AMENDED COMPLAINT

Instead, it is a distinctive pattern created and designed by Honest solely for use in connection with Honest's genuine products.

24. Honest has utilized the Rainbow Stripe Print in connection with the manufacture, advertising, and sale of baby products, including crib sheets, changing pad covers, blankets, coveralls, towels, cotton diapers, and sleepwear for infants. An example of such use is shown below:



25. Since first developing and introducing the Rainbow Stripe Print, Honest consistently used and still uses the Rainbow Stripe Print on its genuine products only available through Honest and its authorized retailers and distributors.

26. The Feelin' Pine Print and the Rainbow Stripe Print are collectively referred to herein as the "Honest Designs."

27. Since 2022, Honest has invested immense time, effort, money, and other resources in designing, developing, and promoting Honest products that bear the Honest Designs, and has sold millions of such products. As a result, the Honest Designs enjoy wide public acceptance and association with Honest, and have come to be recognized by the public as an indicator of Honest as the single source of products bearing the Honest Designs.

FIRST AMENDED COMPLAINT

**B.    Background of the Parties' Relationship**

28.    On July 19, 2019, Butterblu's predecessor (and parent company) entered into a "License Agreement" with Honest by which Butterblu's predecessor would, in exchange for a royalty payment, license certain of Honest's trademarks and other intellectual property on specific categories of goods, including infant and toddler apparel, bedding, and towels.

29.    On November 25, 2019, Butterblu's parent company assigned its rights and obligations to Butterblu by way of a "First Amendment to License Agreement." (For purposes of this Complaint, the "License Agreement" and "First Amendment to License Agreement" will be referred to as the "License Agreement.")

30.    The License Agreement spanned over a five-year initial term (and a two-year renewal term).  Among other things, it contained guaranteed minimum royalty payments that escalated year over year.  In 2022, the Parties decided to transform the arrangement into a service provider agreement.

**B.    The Parties' Services Agreement**

31.    On August 15, 2022, Honest and Butterblu entered into a Services Agreement for a term from the Effective Date of August 15, 2022 through December 31, 2026.  It was amended on October 24, 2022.  (For purposes of this Complaint, the "Services Agreement" and "First Amendment to the Services Agreement" are referred to as the "Agreement").  The Agreement replaced the License Agreement in its entirety.

32.    Under the terms of the Agreement, "Butterblu will use best efforts to promote and sell Products on Honest's behalf," both on a website (honestbabyclothing.com) and by working with Honest-approved retailers.

33.    Section 4.2 of the Agreement grants Butterblu "a non-assignable[,] nontransferable[,] non-sublicensable license" to use certain of Honest's trademarks during the term of the Agreement, but only "on behalf of Honest and subject to approval by Honest …."  The Agreement provides that the "license will last

- 9 -
FIRST AMENDED COMPLAINT

through the Term unless the Agreement is terminated earlier, at which point the license will terminate at that point."

34. Section 4.2 of the Agreement also provides that Butterblu "shall not take any action or omit to take any action, or make or permit any use of the Trademarks, that disparages Honest or any of its products or services (including any Products), or otherwise dilutes, tarnishes, or impairs the value of the Trademarks and the associated goodwill."

35. Section 4.3 of the Agreement memorializes that Butterblu has sold goods on Honest's behalf and that Honest holds title to the goods. Specifically, it provides that Butterblu "may sell Products on Honest's behalf (with Honest being the seller of record) to any and all retailers: (a) to whom Honest sells its own Products; and/or (b) are approved by Honest …." Relatedly, in Section 4.10.4 of the Agreement, Butterblu agreed its website would "not offer for sale nor sell any goods other than Products that have been approved by Honest …."

36. The Agreement sets forth Butterblu's obligations with respect to the design and sourcing of the Products, including but not limited to the following:

a. **The Design and Production Plan**: Section 3.2 requires Butterblu to provide a Design and Production plan to Honest on a quarterly basis that sets forth key data points such "the estimate of inventory purchases of Products that will be needed for the upcoming 12-month period along with launch plan, styles of product being produced, estimated product cost and suggested selling price … for Honest approval." Because Honest has paid for all Products and is the seller of record, Honest needed to approve the Design and Production plan to ensure that the amount and style of Products purchased from suppliers would be appropriate and in line with forecasts. Under Section 3.2, Butterblu needed to keep Honest aware of any issue that might cause a deviation or delay in the Design and Production Plan.

- 10 -
FIRST AMENDED COMPLAINT

b.      **Purchase Order Approval**: Section 7.1 requires Butterblu to obtain Honest's approval before placing any purchase order for Products.

> Butterblu shall submit requests to Honest to place purchase orders (including unit quantities and total costs by SKU) consistent with the Design and Production Plan. Honest shall then provide to Butterblu written purchase orders for Product ("Purchase Orders") and each Purchase Order shall be incorporated herein by reference and governed exclusively by the terms set forth in the Purchase Order. In the event a provision in any Purchase Order is inconsistent with the terms and conditions of this Agreement, the terms of this Agreement shall control. Butterblu will submit Purchase Orders to Honest, using the Purchase Order template provided by Honest. Upon Honest's receipt of a Purchase Order, Honest shall provide its approval within 2 business days. If not disapproved within 2 business days, such Purchase Order shall be deemed approved provided the dollar amount of the Purchase Order is within the Business Forecast. Butterblu will then place the Purchase Order with the supplier.

c.      **Access to Purchase Order Tracking System**: Section 3.2 provides that Butterblu would "provide Honest with access to its monthly purchase order tracking system" so that Honest could have visibility into the purchase orders placed for Products.

d.      **Transition of Key Sales Information**: On the Effective Date of the Agreement, Section 10.2 obligated Butterblu to provide Honest with information and support "to transition accounting, operations and EDI from Butterblu's systems to Honest's systems, including shipping and transport, payment, EDI, product setup, websales, and customer setup."

e.      **Sales Planning**: The Agreement requires Butterblu to provide a monthly rolling 12-month forecast with projections for sales, costs of goods, Net Revenue, and Gross Profit Percentage for the applicable reporting period.

FIRST AMENDED COMPLAINT

f.  **Quarterly Meetings**: The Agreement requires Butterblu to meet with Honest at the beginning of each Contract Quarter to discuss projected sales and marketing plans for the Products.

g.  **Approval on Pricing**: As the seller of record, Honest has the right to set the sale price of Products sold on the website and to retailers.  The Agreement also requires Butterblu to engage in "meaningful consultation in relation to any changes to [Product] pricing and budget for discounts ...."

h.  **Delivery of Goods**: In Section 5.1, Butterblu agreed to "deliver to Honest or its designee the specified quantity of Product conforming to the requirements set forth in this Agreement at the delivery destination and by the delivery date specified in a Purchase Order" with "[t]itle and risk of loss or damage to the Products … pass[ing] to Honest only when the Products are delivered to Honest's designated destination."

37.  The Agreement also sets forth the terms under which Honest authorized Butterblu to utilize the Honest Marks in connection with the Products, some of which are identified in Exhibit A to the Agreement, and other intellectual property owned by Honest, including the Honest Designs. Those terms include, but are not limited to, the following:

a.  Section 1.12 defines "Intellectual Property" under the Agreement as "Trademarks, copyrights and trade secrets, designs, patterns, samples, finishes, know how, the appearance of products, fabric prints, package designs and labels."

b.  Section 2.5.1 explains the effect of termination of the Agreement on Butterblu's authorization to use the Honest Marks. Specifically, upon termination of the Agreement, Butterblu was required to "immediately discontinue use of the Trademarks and Honest Prints, whether in connection with the sale, advertisement or manufacture of Products or otherwise, and will not resume the use thereof or adopt any colorable

- 12 -

imitation of the Intellectual Property therein, or any of their components or designs incorporated therein or material parts thereof."

c.    Sections 3.4 and 4.2 require Butterblu to use Honest's trademarks on all Products, packaging, and promotional materials pursuant to Honest's guidelines and subject to Honest's approval, and not to take any action or refrain from any action that would diminish Honest's standing or that of its products, its trademarks, and associated goodwill.

d.    Section 8.1 affirmed Butterblu's express acknowledgment that "it shall acquire no right, title or interest in or to the Trademarks, copyrights or any prints and patterns provided by Honest under this Agreement ("Honest Prints"), or derivatives thereof, as that term is understood under US copyright law."

e.    Section 8.2 required Butterblu to refrain from selling or transferring any goods labeled with the Honest Marks, or any other intellectual property owned by or licensed to Honest, to any other person or entity other than Honest without Honest's express written consent. Butterblu was further required to comply with Honest's instructions regarding the method of disposal of such goods.

38.    In exchange for Butterblu's services, the Agreement provides that Butterblu is to (1) be reimbursed for "the costs to Butterblu for finished Product," and (2) eligible for a "Base Service Fee" and "Quarterly Service Fee."

39.    As part of the transition from the License Agreement to the Agreement, Honest entered into a Bill of Sale by which Honest purchased from Butterblu all Honest Baby Clothing® branded Products inventory, free of any liens and encumbrances, owned by Butterblu through the Effective Date.  The Bill of Sale was executed on August 22, 2022, and thereafter Honest took title to all Honest Baby Clothing® Product inventory as of the Effective Date.

- 13 -
FIRST AMENDED COMPLAINT

40.     The Agreement provides that "[e]ither Party will have the right to immediately terminate this Agreement by giving the other Party a notice of termination, without giving the other Party any right to cure, if such other Party … breaches this Agreement and that breach is incapable of complete cure …."

41.     Section 16.10 of the Agreement ("Governing Law") provides that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to choice of laws princip[le]s thereof."

42.     Section 16.11 of the Agreement ("Jurisdiction") provides that "[t]he parties hereby consent to the exclusive jurisdiction of the United States District Court for the Central District of California and any of the courts of the State of California, County of Los Angeles in any dispute arising under this Agreement …." It further provides "that service of process" of any complaint "will be effective if in writing and issued" in conformance with the notice provisions of the Agreement. The notice requirements of the Agreement allow for e-mail or air courier service.

### C.     Butterblu Has Materially Breached the Agreement.

#### 1.     *Ordering Products Without or in Excess of Honest's Approval*

43.     The Agreement requires Butterblu to provide Honest with access to its Purchase Order tracking system and to obtain approval of Purchase Orders before issuing them to suppliers.  These terms are material given that Honest owns title to the Products and reimburses Butterblu for the costs of sourcing the Products. Butterblu, however, never shared the Purchase Order tracking system with Honest.

44.     By 2023, Butterblu began to order Products from suppliers without seeking approval from Honest or in excess of the approval granted by Honest. Butterblu also placed orders after May 2023 that included certain intellectual property after Honest expressly withdrew Butterblu's ability to use such intellectual property.

45.     Based on current information, Honest estimates that Butterblu ordered millions of dollars in unapproved inventory utilizing the Honest Marks, including

- 14 -

inventory for which (a) Butterblu did not secure approval of a Purchase Order as required by the Agreement; (b) Butterblu ordered in excess of what Honest had approved in a Purchase Order; or (c) Butterblu ordered after Honest expressly disapproved a Purchase Order.  Under the Agreement, Honest has no obligation to pay for—and is entitled to a refund—for all such unapproved orders.

46.    On information and belief, and notwithstanding having no authorization to do so, Butterblu has offered for sale and sold unapproved Products in interstate commerce.

### 2.    *Failing to Share and Update Information*

47.    The Agreement required Butterblu to share sales and other information with Honest beginning on the Effective Date, as well as to update Honest and third-party sellers about certain information.  Butterblu, however, has failed to provide Honest with the required information despite follow-up requests. For example:

a.    On or about March 4, 2025, Honest requested that Butterblu provide information, including but not limited to the catalogue of active SKUs and discontinued SKUs; Amazon product identification numbers for each SKU sold on Amazon; and key dates for various retailers including when line review meetings would take place, when merchandise resets would take place, when shipments would take place, and when business would be awarded.  Butterblu refused to provide this information, and has continued to fail to provide such information despite Honest's repeated requests.

b.    On or about May 20, 2025, Honest emailed to ask Butterblu to (i) provide Honest with information relating to accounting, operations, product setup, web sales, and customer setup, such as an Item Master List for all Products (including information like product specifications and dimensions, UPC codes, and MSRP), (ii) identify Honest – and not Butterblu – as the owner of all Products on Amazon's sales portal (called Brand Registry); (iii) provide Honest with Amazon product identification numbers

- 15 -
FIRST AMENDED COMPLAINT

for each SKU sold on Amazon, as well as other product information such as pricing, descriptions, and what Products are active or discontinued; (iv) provide current selling and discount terms for each retailer that buys the Products.  Butterblu failed to furnish the required information and, to date, Butterblu has failed to comply with this request.

### 3.    *Failing to Follow Honest's Direction on Pricing*

48.    In or about July 2025, Honest instructed Butterblu to raise pricing on Products as soon as possible.  Butterblu refused to do so, stating "we did not and cannot agree to a broad-based/across-the-board … increase."  Butterblu also promised to provide pricing information, but failed to do so.

49.    Honest reiterated that, under the terms of the Agreement, "all pricing changes require alignment and approval from [Honest] prior to implementation" and requested a meeting to discuss pricing and "align on next steps before any action is taken."  Butterblu refused and said it already addressed such matters by implementing its own strategy.

### 4.    *Failing to Meet Business Forecasts and Budgets*

50.    Butterblu has missed business forecasts and neglected to meet with Honest to adequately discuss and address shortfalls.

### 5.    *Refusing to Return Excess Fees*

51.    Honest is owed substantial credits or refunds from Butterblu because, to date, fees paid to Butterblu have not fully accounted for write-downs or reserves that Honest is permitted to take under the Agreement.  Butterblu has refused to credit or return excess fees it has received.

### 6.    *Wrongfully Asserting Ownership and Control of Honest's Products*

52.    Butterblu has threatened to assert, and on information and belief has asserted, ownership and control over Products owned by Honest or subject to Honest's control because the Products bear the Honest brand. Butterblu also has

- 16 -

threatened to impose liens on Products despite the lack of any such right under the Agreement.

### 7.    *Misrepresenting Information to a Key Retailer*

53.    In 2024, Honest arranged for Butterblu to meet with a major retailer about a line of Honest-branded pet-care products.  After the meeting between Butterblu and the major retailer, the retailer cancelled a 2024 launch of a Honest-branded pet line.

54.    On information and belief, Butterblu inaccurately represented during the meeting with the major retailer that Honest lacked the necessary intellectual property for a branded pet line and proposed that the retailer instead purchase a private label pet line solely through Butterblu.  The retailer declined.

55.    Beyond the lost opportunity to expand a relationship with a major retailer and launch a new product line, the incident diminished Honest's goodwill and credibility with the retailer.

### 8.    *Developing and Selling a Competing Baby Apparel Product Line*

56.    Butterblu not only failed to competently perform under the Agreement, but actively worked to compete against the very product line Butterblu was responsible for selling for Honest.

57.    In or about November 2025, and unbeknownst to Honest, Butterblu began selling an organic baby clothing line on its new website, www.butterblu.com, and on Amazon.  The baby clothing line included infant and toddler apparel, bedding, and bathtime washcloths. Butterblu advertises, sells, and ships its baby clothing line in commerce throughout the United States.

58.    Butterblu actively concealed its plan to premiere a competing product line from Honest.  On information and belief, Butterblu worked for nearly six months planning, developing, designing, sourcing, and selling this competing product line and did so surreptitiously to evade notice by Honest.  Indeed, Honest

- 17 -
FIRST AMENDED COMPLAINT

only discovered this competing "Butterblu" line of apparel, bedding and bathtime products after Butterblu had already publicly launched it in direct competition with the Honest Baby Clothing® Products.

59. Butterblu developed, and now markets and sells, its "Butterblu" line for and to the same customers that it was supposed to be using its best efforts to sell the Products. As is self-evident from Butterblu's online storefront and the overall appearance of the competing products themselves, Butterblu copied the look, feel, and designs of the Products.

60. Butterblu has also improperly utilized a Meta ads account owned by Honest and intended to host ads for Honest Baby Clothing® Products to instead promote Butterblu's competing baby apparel line. Honest previously granted Butterblu access to this account for the purpose of placing ads for Honest Baby Clothing® Products. Notwithstanding Honest's termination of the Parties' relationship, in or around February 2026, Butterblu accessed Honest's Meta ads account without authorization and placed ads for Butterblu's competing baby apparel line through that account. On information and belief, Butterblu did so knowingly and intentionally to target Honest's consumer base for its competing baby apparel line.

61. In addition to failing to exercise best efforts, and instead actively working in secret to undermine Honest, Butterblu intended to breach, is in active breach, and has made clear that it intends to continue to breach another obligation under the Agreement by continuing to sell the above-described items, violating a prohibition against selling "any colorable imitation" of the Products.

62. Butterblu's competing products also include confusingly similar imitations of Honest's prints and designs that originated from Honest's own designs. In particular:

a. Butterblu began offering for sale "Holiday Pine Time" pajamas that imitate Honest's Feelin' Pine Print, including use of the distinctive

- 18 -
FIRST AMENDED COMPLAINT

pattern of alternating holiday trees against a winter landscape background.  A side-by-side comparison of Honest's authentic Feelin' Pine Print pajamas (left) alongside Butterblu's competing and infringing "Holiday Pine Time" pajamas (right) that were offered for sale on www.butterblu.com and on Amazon appears below:

| Honest's Feelin' Pine Pajamas | Butterblu's "Holiday Pine Time" Pajamas |
|---|---|
|  | |

b.      Butterblu also began offering for sale a "Pink Sunny Rainbow" sleeper that imitates Honest's Rainbow Stripe Print, including use of the distinctive pattern of a pastel rainbow-colored gradient in horizontal stripes that alternate with white stripes.  A side-by-side comparison of Honest's authentic Rainbow Stripe Print sleeper (left) alongside Butterblu's competing and infringing "Pink Sunny Rainbow" sleeper (right) that was offered for sale on www.butterblu.com appears below:

- 19 -
FIRST AMENDED COMPLAINT

| Honest's Rainbow Stripe Print Sleeper | Butterblu's "Pink Sunny Rainbow" Sleeper |
|---|---|
|  |  |

63.    Butterblu's "Holiday Pine Time" pajamas and "Sunny Pink Rainbow" sleeper are collectively referred to herein as the "Infringing Products."

64.    Additional images of Honest's products with the Honest Designs and Butterblu's Infringing Products are attached hereto as **Exhibit F**.

65.    Butterblu intentionally copied the Honest Designs so that the Infringing Products would have a confusingly similar appearance as compared to Honest's products with the Honest Designs, to capitalize on the goodwill and recognition developed by Honest, and to deceive consumers into believing the Infringing Products are associated with Honest.

66.    Butterblu's use of confusingly similar imitations of the Honest Designs is likely to deceive, confuse, and mislead consumers and prospective consumers into believing the Infringing Products are affiliated or associated with, or sponsored by, Honest.

67.    Butterblu's conduct has resulted in actual consumer confusion.  For instance, consumers have commented on online forums, such as Reddit, that

FIRST AMENDED COMPLAINT

Butterblu's products "look like" Honest's products but "rebranded" or similar language, that Butterblu is the "creator" of Honest's products, and otherwise expressed confusion as to the source of and/or the affiliation between the Parties' respective products.  In addition, at least one consumer has contacted Honest with questions about a recent purchase in which the consumer intended to buy Honest products from Amazon, but instead received products bearing a Butterblu label.

**D.     Plaintiff Terminated the Agreement.**

68.     On November 5, 2025, Honest terminated the Agreement based on Butterblu's failure to adhere to material terms of the Agreement—breaches which cannot be cured.

69.     On November 13, 2025, in an effort to find a resolution or narrow areas of dispute, Honest agreed to dismiss its Complaint without prejudice and to allow Butterblu to continue to sell through November 30, which was later extended through December 22, 2025, with Butterblu agreeing to provide customer service support through December 31, 2025.

70.     By December 28, 2025, it became apparent that Honest could not and would not cure the material breaches of the Agreement.  Butterblu did not even abide by its promise to provide customer support through the end of the year for post-November 13 sales of Products, instead informing customers that "all outstanding order-related inquiries are now being handled directly by The Honest Company's Customer Service Team" and directing customers to Honest's customer service email, even though Butterblu knew full well that Butterblu alone had the order information for online orders placed by such customers.

71.     On information and belief, Butterblu continued to offer for sale and sell the Products (including the Products Butterblu ordered without or in excess of Honest's authorization), including after Honest terminated the Agreement but before any extended sell-through period and after the extended sell-through period had expired.

- 21 -
FIRST AMENDED COMPLAINT

**E.    Butterblu Has Misrepresented Honest's Commercial Activities.**

72.    Butterblu's website offering its competing baby apparel line, www.butterblu.com, includes a webpage titled "A Note From Our Founder," available at https://butterblu.com/pages/a-note-from-our-founder.

73.    Butterblu's "A Note From Our Founder" webpage includes a statement from Butterblu's founder Michelle Visser that makes misleading representations of fact about Honest's commercial activities in connection with Butterblu's promotion and advertising of its competing baby apparel line.

74.    Specifically, the "A Note From Our Founder" webpage describes Butterblu's prior business relationship with Honest, and misleadingly states that "Honest's new leadership team ultimately decided to exit the apparel space[.]"

75.    Although Honest's business relationship with Butterblu has ended, HONEST-branded apparel continues to be advertised, offered for sale, and sold to consumers, contrary to the representations made on Butterblu's website. HONEST-branded apparel products are currently available for sale through Amazon and Honest's other authorized retail partners.

76.    By misleadingly asserting that Honest "ultimately decided to exit the apparel space" on the same website, www.butterblu.com, where Butterblu sells its competing baby apparel line, including the Infringing Products, Butterblu has misrepresented the nature, characteristics, and/or qualities of Honest's commercial activities, and the misrepresentation is likely to cause confusion, to cause mistake, or to deceive consumers.  In particular, consumers are likely to be confused and misled into believing that they can no longer purchase Honest baby apparel, such that they should purchase Butterblu's competing baby apparel line, and the Infringing Products, instead.

77.    Butterblu made this misleading statement notwithstanding that it knows that HONEST-branded apparel remains available for consumers to purchase

through Honest's authorized retail partners and that, under the Agreement, Honest has a one-year sell off period for existing inventory.

78. In light of the foregoing breaches, infringements, disputes, and disagreements, Honest has filed this Complaint and asserts the Claims below.

## CLAIMS

## COUNT 1 – FEDERAL TRADEMARK INFRINGEMENT

79. Honest incorporates and relies upon paragraphs 4–6, 13–37, 40, 43–46, and 68–71 as though fully set forth herein.

80. The Honest Marks are registered marks within the meaning of 15 U.S.C. §§ 1114 and 1127.

81. Butterblu used the Honest Marks without authorization in connection with the sale of the Products, including the Products Butterblu ordered without or in excess of Honest's approval, after Honest terminated the Agreement but before any extended sell-through period, and after the extended sell-through period had expired.

82. Butterblu's unauthorized use of the Honest Marks in connection with the sale of Products constitutes use in commerce of a reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of goods that is likely to cause confusion or mistake, or to deceive, in violation of 15 U.S.C. § 1114.

83. On information and belief, Butterblu's violations have been knowing, deliberate, willful, and in bad faith. In particular, Butterblu knew of Honest's rights in the Honest Marks and that it was not authorized to utilize the Honest Marks in connection with the Products.

84. Honest has been damaged by Butterblu's conduct in an amount to be proven at trial.

85. Honest's injuries, particularly damage to its goodwill and reputation, are ongoing and will continue unless injunctive relief is granted. Honest is thus

entitled to injunctive relief pursuant to 15 U.S.C. § 1116 and recovery of damages pursuant to 15 U.S.C. § 1117.

### COUNT 2 – FEDERAL TRADE DRESS INFRINGEMENT

86.    Honest incorporates and relies upon paragraphs 4–6, 13–37, and 56–71 as though fully set forth herein.

87.    Honest owns a protectable trade dress through its creation, design, and use of the Honest Designs.

88.    The Honest Designs are non-functional.

89.    The Honest Designs are inherently distinctive or have acquired distinctiveness through secondary meaning.

90.    Because of the continuous and exclusive use and promotion of the Honest Designs since 2022, and Honest's sale of millions of products bearing the Honest Designs, consumers uniquely associate the Honest Designs with Honest.

91.    The Infringing Products offered for sale by Butterblu bear a confusingly similar imitation of the Honest Designs, including use of the distinctive pattern of alternating holiday trees against a winter landscape background reflected in the Feelin' Pine Print, and the distinctive pattern of a pastel rainbow-colored gradient in horizontal stripes that alternate with white stripes reflected in the Rainbow Stripe Print.

92.    Butterblu's use of confusingly similar imitations of the Honest Designs are likely to cause confusion, or to cause mistake, or to deceive, including without limitation as to the origin, sponsorship, or approval of Butterblu's products and services in violation of 15 U.S.C. § 1125(a).

93.    The foregoing acts by Butterblu have been willful, intentional, and in disregard of Honest's rights.

94.    Honest has been damaged and is currently being damaged by Butterblu's actions, in an amount to be proven at trial.

95.     Honest's injuries, including damage to its goodwill, will continue unless injunctive relief is granted.

## COUNT 3 – FEDERAL FALSE ADVERTISING / UNFAIR COMPETITION

96.     Honest incorporates and relies upon paragraphs 4–6, 13–37, and 56–77 as though fully set forth herein.

97.     Butterblu has made misleading representations of fact in commercial advertising and promotion that misrepresents Honest's commercial activities, namely, misleadingly representing on Butterblu's website www.butterblu.com that Honest's leadership "ultimately decided to exit the apparel space."

98.     This representation of fact misrepresents the nature, characteristics, and/or qualities of Honest's commercial activities, and is likely to cause confusion, or to cause mistake, or to deceive, in violation of 15 U.S.C. § 1125(a).  In particular, the representation is likely to confuse and mislead consumers into believing that they can no longer purchase HONEST-branded baby apparel, such that they should purchase Butterblu's competing baby apparel line, including the Infringing Products, instead. Contrary to Butterblu's representation, HONEST-branded apparel continues to be advertised, offered for sale, and sold through Honest's authorized retail partners.

99.     The foregoing acts by Butterblu have been willful, intentional, and in disregard of Honest's rights.  Although Honest terminated the Agreement and Butterblu is no longer an authorized distributor of the Products, Butterblu knows that HONEST-branded apparel remains available for sale through Honest's approved distributors and retailers, and made this misleading representation notwithstanding that knowledge.

100.   Honest has been damaged and is currently being damaged by Butterblu's actions, in an amount to be proven at trial.

101. Honest's injuries, including damage to its goodwill, will continue unless injunctive relief is granted.

### COUNT 4 – BREACH OF CONTRACT, INCLUDING
### OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

102. Honest incorporates and relies upon paragraphs 4–6 and 13–71.

103. Honest and Butterblu entered into a contract, namely the Agreement.

104. Honest has done all, or substantially all, of the significant things that the Agreement required of it or was excused from having to perform certain obligations under the Agreement, including because Butterblu failed to cure material breaches and Butterblu's material breaches were not curable.

105. Butterblu has failed to comply with multiple express and implied obligations and terms of the Agreement, including despite follow-up requests by Honest in an effort to secure compliance. Butterblu's conduct defeated the express and implied purpose of the Agreement, reflected a lack of honesty and fairness, and unreasonably interfered with Honest's right to receive benefits under the Agreement.

106. Honest has not agreed to waive or excuse Butterblu's noncompliance.

107. Butterblu's breaches were the exclusive or a substantial factor in causing harm to Honest.

### COUNT 5 – BREACH OF FIDUCIARY DUTY

108. Honest incorporates and relies upon paragraphs 4–6 and 13–71.

109. Over the course of a multi-year relationship, Butterblu repeatedly assured Honest that Butterblu would act in Honest's best interests to maximize sales and profitability. In reliance on such assurances, which extended beyond obligations set forth in the Parties' contracts, Honest did not take certain actions it otherwise would have taken and entrusted Butterblu with extensive responsibilities, which Butterblu voluntarily accepted. Among other things, Butterblu was entrusted with, and often had exclusive knowledge of critical information about, the Products,

FIRST AMENDED COMPLAINT

including with respect to manufacturing, shipments, distributions, customer service, sales, returns, and marketing.  Due to the trust placed in Butterblu, Butterblu ordered and took possession of Products owned by Honest and had the ability to incur specific expenses on behalf of Honest, including transportation, warehousing, and testing.

110.   Butterblu breached the trust and faith placed in it by Honest, including Butterblu's assurances that it would act with utmost good faith and in the best interests of Honest.  For example, Butterblu breached the trust and faith placed in it by Honest by misstating facts about Honest, attempting to engage in self-dealing, and engaging in self-dealing, including by ordering excessive inventory to maximize service fees, by diverting resources to promote a Butterblu branded line that directly competes with the Products, and by taking other actions to benefit Butterblu at the expense of Honest.

111.   Butterblu's conduct was a substantial factor in causing harm to Honest, including in the form of a lost opportunity to launch a product line, loss of goodwill and reputation with a major retailer, loss of goodwill and reputation with consumers attendant to a new product line, and loss of sales of Honest-branded products.

### COUNT 6 – UNJUST ENRICHMENT

112.   Honest incorporates and relies upon paragraphs 4–6, 13–71, and 109–110.

113.   Butterblu has received money or benefits that belong to Honest and that, in equity, should be awarded or returned to Honest as unjust enrichment, restitution, or in quasi-contract.

114.   Honest alleges unjust enrichment as to matters not expressly covered by the Agreement or other contracts between the Parties, for periods during which the Agreement was terminated, and in the alternative to its breach of contract claim to the extent any contract or contract term is found invalid, unenforceable, or inapplicable.

## COUNT 7 – DECLARATORY RELIEF

115. Honest incorporates and relies upon paragraphs 4–6, 13–71, and 109–110.

116. The Parties currently have a controversy and dispute about their respective rights and obligations under the Agreement.

117. Honest seeks a declaration of its rights under the Agreement, including, among other things, that Honest validly terminated the Agreement due to one or more material breaches by Butterblu, that, whether or not Honest validly terminated the Agreement, Honest is owed refunds for amounts previously paid to Butterblu (such as for write-downs of the value of inventory) and/or for amounts incurred in connection with orders (or portions of orders) placed by Butterblu in excess of approvals, that no termination fee is owed to Butterblu, and that, whether or not Honest validly terminated the Agreement, Butterblu is in breach of the Agreement by selling products that are colorable imitations of the Products.

## PRAYER FOR RELIEF

Wherefore, Honest prays for judgment against Butterblu as to each and every count consistent with applicable law, and pursuant to only those counts so permitted, including:

a. Actual, compensatory, nominal, and special damages, including Butterblu's profits and Honest's damages pursuant to 15 U.S.C. § 1117;

b. Attorneys' fees and costs to the extent recoverable;

c. Punitive damages;

d. Declaratory relief;

e. Preliminary injunctive relief enjoining Butterblu from the unauthorized marketing, advertising, and selling of the Infringing Products, or any other goods or services, using the Honest Marks or the Honest Designs, or a mark that is substantially or confusingly similar to the Honest

FIRST AMENDED COMPLAINT

Marks or the Honest Designs, until the Court has decided the merits of this action;

f.      Permanent injunctive relief enjoining Butterblu from the unauthorized marketing, advertising, and selling of the Infringing Products, or any other goods or services, using the Honest Marks or the Honest Designs, or a mark that is substantially or confusingly similar to the Honest Marks or the Honest Designs;

g.      Any other equitable relief as may be necessary to avoid irreparable harm; and

h.      Such other and further relief that this Court may deem fit and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Local Rule 38-1, Honest hereby demands a trial by jury on all issues so triable.

Dated: March 25, 2026

Respectfully submitted,

SIDLEY AUSTIN LLP

By: */s/ Sean A. Commons*
    Sean A. Commons
    Lauren M. De Lilly

Attorneys for Plaintiff
The Honest Company, Inc.

- 29 -
FIRST AMENDED COMPLAINT